IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

TOMMIE CARTER,

              Plaintiff,

       v.

THOMAS BELZ, KEITH WIEGEL,
SHAWN GALLINGER, SARA MASON, SHANA BECKER,
JONI SHANNON-SHARPE, JOLINDA WATERMAN,
PATRICIA REID, Dr. BURTON COX,
JACQUELINE O'CONNELL and BRIANNA WHITE,

              Defendants.

OPINION AND ORDER

12-cv-301-slc

_____

In this civil lawsuit brought pursuant to 42 U.S.C. § 1983, plaintiff Tommie Carter contends that correctional officers and medical staff at the Wisconsin Secure Program Facility violated his Eighth Amendment right to be free from cruel and unusual punishment by: 1) using excessive force against him; 2) failing to intervene to halt the use of such force; 3) denying him medical care; and 4) housing him in a freezing cold segregation cell.

Carter claims that, about two years ago, while three correctional officers (defendants Belz, Wiegel and Gallinger) were returning him to his cell from the law library, the officers intentionally slammed him to the ground and stomped on his ankle, fracturing it. Then they dragged him to the Health Services Unit where they threw him to the ground and kicked him in the face. Carter claims that defendants Shannon-Sharpe, Becker and Mason witnessed the attacks but failed to intervene. Carter claims that health services unit workers (defendants Waterman, Reid, Dr. Cox, O'Connell and White) failed to treat his injuries properly and ignored his requests for treatment. Finally, Carter claims that defendant Mason ordered him placed in a freezing cold cell in controlled segregation.

The defendants deny each of Carter's claims and all of them have moved for summary judgment.  Dkt. 58.

I am granting defendants' motion on the following claims:

(1) the failure-to-intervene claim against defendants Shannon-Sharpe and Becker;

(2) the excessive force claims against defendants Gallinger, Belz and Wiegel for their alleged conduct in the cell vestibule and during transport to the HSU;

(3) the Eighth Amendment denial of medical care claims against defendants Waterman, Reid, Cox, O'Connell and White; and

(4) the conditions of confinement claim against defendant Mason.

Even accepting, *arguendo,* that Carter's allegations in support of these four claims are true, a reasonable jury could not conclude that any of these defendants acted with the deliberate indifference or the wantonness necessary to support an Eighth Amendment claim.

I am denying defendants' motion for summary judgment on Carter's claim that officers beat him in the HSU.  The parties dispute whether defendants Gallinger, Belz and Wiegel attacked Carter without provocation at that location.  I am denying the motion with respect to Carter's related claim that Mason failed to intervene to prevent the attack.

On five prior occasions, Carter has asked the court to assist him in finding an attorney to represent him in this lawsuit.  Now that this case is headed to trial, I agree that Carter needs assistance of counsel.  Therefore, I will stay further proceedings in this case pending the recruitment of counsel for Carter.

As a preliminary matter, I note that in support of their motion, defendants have submitted 194 proposed findings of fact.  Dkt. 60.  Carter disputes, in whole or in part, 146 of them, relying almost entirely on his own affidavit setting forth his version of events.  Defendants

object to many of these responses on the ground that Carter's affidavit is "conclusory" and "self-serving." However, the Seventh Circuit Court of Appeals "long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'" *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion so long as his averments are based on personal knowledge or firsthand experience,. *Id. see also Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Carter avers to having experienced two beatings that resulted in physical injuries. Such averments suffice to create a dispute as to many of defendants' proposed facts, but not all of them.

For instance, the situation is different with respect to Carter's averments that the officers beat him in his cell vestibule and then manhandled him while transporting him to the HSU and back. All of these incidents were videorecorded and the recordings are in the record. Carter has not disputed the accuracy or authenticity of the tape. A review of the tape establishes that several of Carter's allegations about the officers' actions are plainly false; I have disregarded those allegations in setting out the facts below. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (finding lower court erred in viewing facts in light most favorable to respondent instead of in the light depicted by videotape, which showed that respondent's version of event was "visible fiction").

I have based the following findings of fact on defendants' proposed findings of fact, Carter's responses to those proposed findings, and on the videotape submitted by defendants. The facts are undisputed unless otherwise noted.

3

## FACTS

### I.  The Parties

At all times relevant to this action, plaintiff Tommie Carter was an inmate at the Wisconsin Secure Program Facility (WSPF) in Boscobel, Wisconsin.  The incidents at issue in this lawsuit began on October 11, 2011 while officers were returning Carter to his cell from the law library.  At that time, defendants Thomas Belz, Keith Wiegel and Shawn Gallinger were correctional officers at the institution; Sara Mason was a supervising officer; Shana Becker was a psychological associate; Joni Shannon-Sharpe was a crisis intervention worker; Patricia Reid, Jolinda Waterman, Brianna White and Jacqueline O'Connell were nurses working in the Health Services Unit; and Burton Cox was a physician.

### II.  Excessive Force Claims

#### A.  The Incident in the Cell Vestibule

At approximately 10:45 a.m. on October 11, 2011, Officers Wiegel and Belz were escorting inmate Carter from the law library back to his cell, Alpha 202.  Carter's hands were cuffed behind his back and he was in leg restraints.  The videotape of the incident shows that when Belz, Wiegel and Carter reached the cell vestibule, Carter lunged sideways to his left and slightly backwards towards Belz, who was slightly behind Carter on his left, and attempted to

pull away from Belz's grasp.[1]   Carter's head and left shoulder made contact with Belz's left upper shoulder region.

Immediately, Belz and Wiegel "decentralized" Carter to the floor, where they secured him and ordered him to stop resisting. Although defendants do not offer any description of what it means to "decentralize" an inmate, the video shows that the officers quickly applied holds to Carter's head and upper body and used their body weight to push Carter (and themselves on top of him) to the ground. They did not lift Carter off the floor and they did not grab his wrists. Because their backs are toward the high-mounted camera as they descend, it is impossible to discern how hard Carter hit the ground. According to Carter, he was "slammed" into the ground, which caused an injury to his right eye.

Once all three were on the floor, Belz placed his lower leg across Carter's legs to secure him, while Wiegel maintained contact with Carter on his left side. Carter's wrists were cuffed behind him but otherwise free. Belz stayed in this position for approximately 50 seconds, before getting up and off of Carter, who was at this point lying still. Belz did not stomp on Carter's right ankle; he didn't even step on it. To the contrary, it appears that Belz took care *not* to step on Carter during the entire incident.

---

[1]   Belz and Wiegel aver that prior to arriving at the cell vestibule, Carter made threats towards Belz. Carter denies this: instead, he says, Belz was bending his wrist, causing pain, and that when Carter asked him to stop, Belz told Carter to "stop crying like a little bitch." The videotape from the hallway clearly shows that Belz's hand was on Carter's upper arm, not his wrist. However, where Belz was grasping Carter when they arrived in the cell vestibule seconds later cannot clearly be seen on the videotape from the cell vestibule. In any case, I do not understand Carter to be claiming that Belz violated his Eighth Amendment rights merely by bending his wrist; his claim is based on the force applied by Belz after Carter attempted to pull his arm away.

5

Defendant Gallinger, who was conducting medication rounds nearby, ran into Carter's cell to help secure Carter to the floor after he heard Belz and Wiegel ordering him to stop resisting.  One of the officers notified the supervising officer on duty, Captain Mason, that Carter was "being resistive" and was refusing to go back into his cell.

Captain Mason arrived at the cell vestibule shortly thereafter.  Mason observed that Belz, Wiegel and Gallinger had secured Carter to the floor and were repeatedly ordering him to stop resisting.  According to Carter, at this time he was screaming for help and asking if different officers could transport him to HSU.  Carter's face is not visible on the video and there is no sound, so I must accept his version of this event as true.  The video depicts, however, a calm situation:  Carter is lying still on the floor.  Wiegel is leaning next to him on his left, speaking to him occasionally. Belz is standing to Carter's right. Gallinger is standing near Carter's head, bending down and maintaining a hand on his side or back while appearing to talk to Carter.

Carter told Mason that he wanted to go to the HSU because the officers had hurt his eye and he was injured.  Mason directed the officers to transport Carter to the HSU for a medical assessment.

According to the four security officers who were present, Carter stated that he was not going to walk; when they assisted him to his feet, he went limp and refused to stand up or walk on his own.  Carter denies this; he says he tried to walk but was not able to do so because of the pain in his ankle.[2]  Although the video does not support Carter's allegation that he attempted to bear weight on his right ankle but could not, it is undisputed that Carter did not get off the

---

[2] Carter has maintained throughout this entire lawsuit that his ankle was fractured even though, as discussed below, the x-ray evidence indisputably establishes that there was no fracture.

floor and walk or limp to the HSU under his own power.  Instead, Officers Gallinger and Wiegel applied wrist compliance holds on Carter to help him to his feet.  Then the officers turned him around so his back was facing the open door; Belz supported Carter's head.  Wiegel and Gallinger pulled Carter out of the vestibule backwards in a controlled manner, with their arms interlocked with Carter's at the elbows.  Carter's head was facing up toward the ceiling.  His body was upright but tilted backward.  His feet were dragging behind him.

No one dragged Carter by the head.  Wiegel and Gallinger each had one of Carter's arms while Belz supported Carter's head.  Mason followed.  It only took about 10 seconds for the group to get from Carter's cell vestibule to the HSU.  Video shows that Carter's transport proceeded calmly with no sudden or forceful movements by either Carter or the security officers.  Carter does not appear to be screaming.  Carter and the officers arrived at the HSU at approximately 10:44 a.m.  Once the group was inside, the doors to the HSU were left open.

### B.  The Incident at the HSU

Unlike the events in the cell vestibule and hallway, the events in the HSU took place off-camera.  This means there is no video evidence to support or refute either of the completely contradictory versions of what happened next.  According to Carter, upon arrival in the HSU, Belz, Wiegel and Gallinger knocked or threw him to the floor, then repeatedly kicked and struck him in the face, causing numerous cuts, bruises and lacerations on Carter's wrists, face and head, while Carter screamed for help and Mason stood by watching.  The four officers all deny that anyone used any excessive force on Carter at any time that day.  Defendants Shannon-Sharpe and Becker, who were in the hallway near the HSU from the time Carter was brought there by

7

the officers until nursing staff arrived four minutes later, say that at no time did they hear Carter yell or request help when he was in the exam room.  Neither Becker nor Shannon-Sharpe has any authority or role in making security decisions.[3]

At approximately 10:48 a.m., nurses Reid and Waterman entered the HSU and examined Carter.  According to Reid's contemporaneous medical report, Carter stated that the officers had thrown him to the floor when leaving the lawyer's booth.[4]  The report states that Carters's chief complaints were that his right eye and right wrist hurt.[5]  Reid and Waterman performed a medical examination of Carter.  On her report, Reid noted tenderness under Carter's right eye, but no swelling or bruising.  With respect to Carter's wrist, Reid noted that it appeared slightly red, but Carter was able to move it and the skin was intact.[6]  Nurse Reid offered plaintiff pain medication, which he refused to take.[7]

---

[3] Carter has occasionally observed Shannon-Sharpe and Becker operating panels in the sergeant cage that open doors on the unit.  This is not enough to place this fact into genuine dispute.

[4] Carter says that he told the nurses the incident occurred after being escorted back from the law library, not the lawyer's booth.  Carter is probably correct on this point, but the dispute is immaterial. Worth noting, however, is that Carter does not contend that he told the nurses about the brutal beating he now claims to have suffered just before the nurses entered the HSU.

[5] Carter disputes the accuracy of the medical records, asserting that he also told the nurses that he had a knot on his head that was bleeding and that his right ankle was painful, swollen and "fractured." The nurses deny that he reported any leg, foot or ankle pain.

[6] Again, Carter disputes the accuracy of Reid's report: Carter says that Reid told him that his right eye was swollen and bruised and that his right wrist had bruises and abrasions on it, that his skin was not intact and that he should put ointment on it to help it heal.

[7] Reid and the five other witnesses in the room have testified, consistent with the medical record, that Reid offered Carter Tylenol.  Carter insists that she offered him ibuprofen, which he refused to take because of a stomach condition.  However, Carter does not dispute that he had an order for Tylenol for pain and discomfort (although he disputes that Reid ordered it).  Plt.'s Response to Def.'s PPFOF, dkt. 88 ¶ 44 ("Carter already had an order for Tylenol for pain and discomfort").  In any event, it is undisputed that Reid recommended that plaintiff take pain medication and that pain medication other than ibuprofen was available to him.

After the examination in HSU, at 10:54 a.m., Gallinger, Belz and Wiegel escorted Carter backward to his cell, face up, head supported and feet dragging, the same way they had escorted him to the HSU.[8]  Again, the transport proceeded calmly and non-violently.[9]   At his cell, the tether strap was placed on Carter's wrist and he was given an order to kneel down, which he did. Mason ordered Belz to use emergency shears to cut off Carter's clothes so that a staff-assisted strip search could be completed.  Carter was then assisted into a standing position, leg restraints were removed, Carter was placed in his cell and the door was secured.

Carter was placed in "control status," which means that a determination has been made that it has been impossible to control the person in segregation.  Although no one has testified as to what Carter actually was allowed to have in the cell, inmates in controlled status normally are provided with a clean mattress, sufficient light, sanitary toilet and sink and adequate ventilation and heating, as well as adequate clothing, essential hygiene supplies and nutritionally adequate meals.

---

[8] Defendants say they had to do this because Carter was refusing to stand up or walk; Carter denies this, maintaining that he was unable to walk because his right ankle was fractured.

[9] Carter claims that the video shows him screaming for help as he was being escorted.  I disagree: the video evidence is inconclusive as to whether Carter was screaming for help.  However, the video conclusively shows that no one subjected Carter to any force at that time other than what was necessary to move him from one location to another.

### C. Follow-up Medical Care

After the October 11, 2011 incident, Carter filed numerous Health Service Requests (HSRs) for complaints including, but not limited to, right wrist pain, right ankle pain, and blurry vision in his right eye.  The evidence shows that HSU staff responded to Carter's HSRs as follows:

<u>October 13, 2011</u>

Waterman saw Carter in the HSU in response to two HSRs filed by Carter on October 11 and 12, 2011.  Carter requested pictures of his injuries and stated that his injuries still needed to be addressed.  Carter complained that his right ankle was swollen and sore; his right wrist was cut, bruised and scraped; his right eye was painful, swollen and blurred; and he had a knot on the right side of his head that was bleeding.  During her medical assessment, Waterman observed Carter's right ankle was tender to the touch but was not red, swollen or bruised.

Waterman offered Carter acetaminophen in a liquid form, which Carter accepted.  She also applied double antibiotic ointment to the abrasion on his wrist.  Waterman advised Carter to use a cool cloth on his right eye if it helped with the discomfort and ordered eye drops for his eye.  She explained that he could take more pain medication or use eye drops more frequently depending on his pain or discomfort.

<u>October 16</u>

On October 16, 2011, defendant O'Connell assessed Carter in the HSU in response to an HSR submitted October 13, 2011, in which Carter stated that his right eye was burning and hurt, his right ankle was still hurting and was hard to walk on, and his right wrist was sliced open

and bleeding a little.  O'Connell assessed Carter based on his complaints.  She provided him with ice for his ankle and for his right eye, and told Carter that she would review his complaints to determine if follow-up with an eye doctor was necessary.  Later, O'Connell wrote a response to the October 13 HSR, stating that Carter had been seen that day, that he most likely had an ankle sprain without signs of fracture and that he should continue using the Tylenol and eye drops ordered for him.

O'Connell also responded to an October 15 HSR from Carter, in which he complained that he had been denied medical treatment for his right ankle and right eye, he had blurred vision and headaches and the pain was not going away.  O'Connell responded that Carter had not been denied medical attention; to the contrary, he had been placed on the sick call list and had been seen on October 16.

October 17

On October 17, 2011, defendant White responded to an October 16 HSR from Carter in which he repeated his complaints about his right eye and right ankle and asked to see a specialist.  He also incorrectly stated that O'Connell had said that Carter's right ankle was fractured.  White responded that Carter had been placed on the list to see a doctor, noting that he needed a referral from a doctor before he could see a specialist.

October 18

The HSU received two complaints from Carter, dated October 17, 2011, complaining of right eye and right ankle pain.  In the complaints, Carter stated that he was being denied medical care that left him in unnecessary pain and that Tylenol was not helping.  Defendant Waterman responded to both complaints.  She informed Carter that he had been seen by HSU staff many times, that he was on the list to see Dr. Cox  and that he had Tylenol.

October 19

The HSU received two more complaints from Carter, dated October 18, 2011.  In one, Carter stated that he had blurred vision in his right eye and he wanted to be seen by an optometrist; Waterman responded that he was on the list to see the optometrist and a co-pay would apply.  In the second complaint, Carter stated that Waterman had denied him medical care that left him in unnecessary pain.  Waterman responded that he had already been seen for that request and that he was scheduled to see Dr. Cox the next day.

October 20

On October 20, 2011, Dr. Cox saw Carter in the HSU.  Carter complained about right ankle pain and blurry vision in his eye.  Based on his examination, Dr. Cox determined that there was no treatment necessary for the ankle.  Although Dr. Cox did not see any conjunctival injury to Carter's eye, he referred Carter to an optometrist, Dr. Chan, for evaluation of Carter's complaints of blurry vision.

12

<u>October 21</u>

The HSU received an HSR from Carter, dated October 20, 2011, asking whether Dr. Cox had scheduled an appointment for Carter to see the optometrist.   Defendant O'Connell responded that he was on the list for the eye doctor.

<u>October 27</u>

On October 27, 2011, Dr. Cox again saw Carter for complaints regarding his right ankle pain and blurry vision in his right eye.  Dr. Cox prescribed eye drops and told him his ankle could take 6-8 weeks to heal.[10]

That same day, HSU received two HSRs from Carter dated October 26, 2011.  In one, Carter stated that his right eye was painful and bleeding and that he had constantly informed HSU of this.  He again accused HSU staff of denying him medical treatment, leaving him in unnecessary pain.  Defendant White wrote back that Carter had been prescribed eye drops for this problem.  In the other complaint, Carter stated that he had notified HSU more than once that his right ankle hurt and was changing colors, but HSU continued to be deliberately indifferent to his medical concerns.  Defendant Reid responded to this HSR, writing that Carter had been seen by Dr. Cox that day.

---

[10] Dr. Cox says he reassured Carter that the ankle was not fractured but might be mildly sprained; Carter claims that Dr. Cox told him his ankle was either sprained or fractured.

13

<u>October 31</u>

On October 31, 2011, Carter had an off-site visit with a podiatrist at UW Health Podiatry.  Dr. Cox had referred Carter to the podiatrist for complaints of pain in his right big toe, which Carter had been complaining about since September 2011.  X-rays taken of Carter's right ankle and foot showed no signs of fracture or dislocation.  He was diagnosed with a bunion in his right foot.  At the time, the plan was to treat Carter's foot conservatively and to order supportive shoes with Velcro and custom-made orthotics, provided  they were approved at the institution.  Once orthotics were approved, Carter was to return for a follow-up appointment for casting.[11]

<u>December 20</u>

On December 20, 2011, Dr. Chan, the optometrist, examined Carter.  Dr. Chan diagnosed Carter with moderate astigmatism in his right eye.  Chan ordered glasses for Carter to correct the astigmatism.  According to Dr. Cox, Carter's astigmatism did not result from him being decentralized to the ground on October 11, 2011.

<u>January 4, 2012</u>

On January 4, 2012, Dr. Cox gave Carter an exercise program to assist with the pain in his right ankle.

---

[11]  Carter eventually had bunionectomy surgery on his right foot on August 22, 2012.

January 23, 2012

On January 23, 2012, Carter had an x-ray taken of his right ankle and foot at 3 different views for his right ankle pain.  The x-ray indicated that Carter's right ankle and foot were normal.

**D.  Conditions of Confinement**

WSPF is a temperature-controlled facility equipped with both heating and air conditioning.  The temperature on the units is maintained at or above 68 degrees Fahrenheit.  Captain Mason has no control over the temperature on the unit.[12]

Carter has alleged that during the 24 hours during which he was on control status in his cell, the temperature was "extremely" cold and that he was not provided with "adequate" clothing or heating.[13]  He alleges that he complained to Mason and to various officers during observation checks that he was cold but they ignored him.  Mason denies that Carter complained to her about the cell temperature.  None of the officers who documented their observations of Carter while he was on control status recorded that Carter made any complaints about cell temperature.

---

[12]  Although Carter insists that Mason can control maintenance to have them adjust the temperature, he offers no evidentiary support for this assertion.

[13]  In his brief, Carter makes additional assertions of fact about the severity of the cold.  However, unsupported statements in a brief are not evidence and cannot be given any weight. *In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir.1985).

OPINION

## I. Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Pertinent to this case is the rule that "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the truth of the matter asserted."  *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998).  *See also Turner v. The Saloon*, *Ltd.*, 595 F.3d 679, 690-91 (7th Cir. 2010) (party opposing summary judgment cannot rely on unsupported *ipse dixit*–that is, his own say-so–that is flatly refuted by the hard evidence offered by its opponent);

## II. Plaintiff's Claims of Excessive Force

16

Carter contends that defendants Wiegel, Belz and Gallinger used excessive force when they:  1) took him to the ground in his cell after he tried to pull his arm away from Belz; 2) dragged him to the Health Services Unit; and 3) arrived in the Health Services Unit.  According to Carter, he suffered a sprained or "fractured" right ankle, numerous cuts, bruises and abrasions on his head and face, and blurry vision in his right eye as a result as a result of the undue force.

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" that is "grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or [is] totally without penological justification."  *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (quoting *Meriwether v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987)).  To prevail on any of his excessive force claims, Carter must establish that the defendants used force not "in a good-faith effort to maintain or restore discipline," but instead acted "maliciously and sadistically to cause him harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citations omitted). Factors relevant to this determination include the need for an application of force, the relationship between the need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed and the extent of the injuries to the prisoner.  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)); *DeWalt v. Carter*, 224 F.3d 607, 619-20 (7th Cir. 1999).

## A.  The Incident in the Cell Vestibule

Carter's version of what happened in the cell vestibule is that he attempted to pull his arm away from Belz because Belz was hurting him, at which point Wiegel shoved Carter into

Belz, who told him to "stop resisting."  Belz and Wiegel then slammed him against the floor, causing his right eye and head to strike the ground.  They also attempted to break his wrists, and Belz stomped on Carter's ankle.

As noted in the recitation of the facts, the video recording clearly establishes that most of what Carter says simply is not true.  Even viewed in the light most favorable to Carter, the video does not support his contention that Wiegel shoved Carter into Belz, that Belz "stomped" on Carter's ankle or that either officer took any action that would support an inference that they were attempting to break his wrists; accordingly, as *Scott* directs, I must disregard these aspects of Carter's testimony.

The only dispute for which the video fails to offers conclusive proof is the amount of force used by Belz and Wiegel to "decentralize" Carter after he lunged back at  Belz.  Carter says that he was "slammed" to the floor; the officers say they acted with no more force than was necessary to gain control of Carter.  Although it is clear from the video that the officers did not "body slam" Carter as that term is commonly used,[14] and although it appears that the officers put Carter on the floor in a somewhat controlled manner, the video does not reveal how hard Carter actually hit the floor because the view of Carter hitting the floor is obstructed by the officers' control holds and by their bodies as they both descend with and partially on top of Carter.

Nonetheless, a clearer view of the force of Carter's impact is unnecessary to resolve Carter's claim.  Prison officials have the right to use "good-faith effort[s] to maintain or restore

---

[14]  "To body-slam is to pick someone's body up and slam it on the ground." Http://www.yourdictionary.com/body-slam, accessed October 17, 2013.

discipline" even when "'it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.'" *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (quoting *Whitley*, 475 U.S. at 319). The video shows that Carter lunged back at one of the escort officers, and Carter admits that he pulled his arm away from the officer. The video shows that both officers reacted swiftly and methodically: without hesitation, they moved in tandem to place control holds on Carter and push him to the ground. Even if the court assumes for the purposes of summary judgment that the officers used more force than was necessary to regain control of Carter, no reasonable juror viewing the officers' actions could conclude that either of them acted "maliciously and sadistically to cause him harm" rather than in good faith in response to a legitimate safety threat. *Guitron*, 675 F.3d at 1046 ("an error of judgment does not convert a prison security measure into a constitutional violation"). *See also Mitchell v. Krueger*, 11-CV-279-WMC, 2013 WL 5442342, *4 (W.D. Wis. Sept. 30, 2013) (slip op.) ("Even if Krueger intentionally brought Mitchell down harder than necessary . . . the effort to bend him over the table to restore discipline was not so unreasonable or wanton to implicate the Eighth Amendment."). As the Supreme Court has recognized, the question of what force is necessary to keep order within the prison is one that "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in [the prison administrators'] judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. 1 at 6 (quoting *Whitley*, 475 U.S. at 321-322).

Further, although Carter avers that he hurt his head and his eye when he hit the ground, he has adduced no evidence to show that either of these injuries was permanent, severe or

required any treatment other than pain medication and eye drops, a fact that supports the officers' contention that they used only the degree of force that was reasonably necessary to gain control of Carter.[15]  Finally, Carter has not put forth any evidence to show that the officers did not believe he was a security threat or that they had a less forceful way to get him under control. In short, the defendants are entitled to summary judgment on this aspect of Carter's excessive force claim.

### B.  Transport to and from the HSU

Carter also appears to be alleging that Belz subjected him to excessive force when Belz grabbed Carter's head and dragged him on the ground to and from the HSU.  The video shows that this did not happen.  As found in the facts, above, Belz supported Carter's head as the other two officers pulled an inert Carter to the HSU, interlocking their elbows with Carter's.  Carter admits that he did not walk on his own to the HSU–he claims he *could* not, sticking to his unsupported claim of a broken ankle–and also admits that he demanded to be taken to the HSU.  What other reasonable choices did the officers have to move Carter to the HSU?  Carter does not say.  Further, Carter does not allege that he suffered any injury during transport.  No reasonable jury could infer from this evidence that defendants used force against plaintiff "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith

---

[15] Carter claims that his later-diagnosed astigmatism was caused by being slammed onto the ground, but he does not purport to be a medical expert, nor has he presented expert testimony to support this pronouncement.  Accordingly, I have disregarded this contention.  *See Walker v. Shansky*, 28 F.3d 666, 671 (7th Cir. 1994) (inmate's self-serving conclusions about his mental health insufficient to withstand motion for summary judgment).

effort to maintain or restore discipline."  The defendants are entitled to summary judgment on this claim.

### C.  The Incident in the HSU

As noted above, the parties offer starkly contrasting versions of what happened in the HSU.  While there is clear video evidence that disproves Carter's claims with respect to the type and amount of force the officers applied to Carter in the cell vestibule and during transport, there is no video recording of what happened in the HSU.

In light of Carter's assertion that the officers viciously beat him, there would seem to be a genuine trial issue as to whether any defendant applied force to Carter maliciously or sadistically for the very purpose of causing harm. *See Hudson*, 503 U.S. at 4 (prison officers' use of force when there was no need for it).  Defendants argue, however, that this court should reject Carter's testimony without a trial.  Although defendants recognize that summary judgment is ordinarily inappropriate where, as here, the parties offer conflicting versions of what happened, they argue that this rule is not absolute.  As defendants point out, the court does have some leeway to reject oral testimony, even where the plaintiff's version of events is not literally impossible. *See Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (stating that "the test [for rejecting testimony as a matter of law] of physical impossibility is not exhaustive" and that the governing principle is that "testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it").  According to defendants, the fact that the videotape refutes most of Carter's testimony about what happened in the cell vestibule and hallway, coupled with the lack of any objective medical evidence to support his claims as to his

alleged injuries, leads to the conclusion that no reasonable juror would believe his claims about what happened in the HSU.

I agree with the defendants that Carter's provably incorrect assertions have shredded his general credibility.  Carter's account of the force used in the cell vestibule and hallway is alarmingly exaggerated if not intentionally false, Carter apparently did not tell the nurses in the HSU that the guards had just beaten him on the HSU's doorstep, and the medical evidence does not corroborate Carter's assertion that he was kicked in the face with "deadly force."  All this being so, I will not take this question away from the jury.  As a starting point, "the maxim *falsus in uno, falsus in omnibus* is no longer followed, when understood as a rule that a trier of fact may or must disbelieve the entirety of a witness's testimony if he disbelieves any part of it."  *United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009).  As the Court of Appeals made clear in a case decided after *Seshadri*,

> Credibility issues are to be left to the trier of fact to resolve on the basis of oral testimony except in extreme cases. The exceptional category is—exceptional. For the case to be classified as extreme, the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all relevant circumstances.

> *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).

In *Seshadri*, for example, the court of appeals found it appropriate to reject Seshadri's testimony, provided in an affidavit in opposition to a motion for summary judgment, that he was the sole author of an article and that Kasraian was not a joint author, where, prior to litigation, Seshadri had made a number of statements acknowledging that the article was a joint work.  130 F.3d at 802-803.  Although the court noted that some of Seshadri's statements in

his affidavit were far-fetched (such as his claim that certain parts of the manuscript that were written in Kasraian's handwriting were actually words that Seshadri spoke and Kasraian merely transcribed), the court mostly was troubled by the fact that Seshadri had made no effort in his affidavit to explain the many prior written statements he had made acknowledging Kasraian as a joint author. *Id.* at 804 ("The plaintiff's admissions show that Kasraian was the joint author of the article, and he could not by filing a blind affidavit—one that failed to explain barefaced inconsistencies with his prior statements—retract those admissions.").

Similarly, in *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), the court upheld the district court's finding that the plaintiff's testimony was "so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used against him." In doing so, the court found that it would require a "suspension of disbelief" for a jury to credit plaintiff's unsubstantiated allegations that police had burst into the room threw him out the window, when, shortly after the incident, plaintiff several times admitted that he had jumped out of the window, plaintiff did not report any police misconduct until nine months after his alleged defenestration, the plaintiff could not identify any of the police officers who allegedly participated in the attack or recall how many there were, and medical evidence contradicted plaintiff's allegation that just before being tossed out the window, he had been brained with a flashlight. *Id.*

The holdings in *Seshadri* and *Jeffreys* rest on the patent, irreconcilable inconsistencies between the stories plaintiffs told on summary judgment and their version of events before they filed their lawsuits. *See also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (finding plaintiff's affidavit insufficient to create genuine dispute of fact where, "[f]rom the

23

complaint, to plaintiff's deposition, to his opposition papers to defendants' summary judgment motion, plaintiff's allegations of the events at issue are replete with inconsistent and contradictory statements.").  In this case, by contrast, defendants have not identified any prior statements or admissions by Carter that are inconsistent with the story he tells in his affidavit. To the contrary, Carter sticks to his story even in the face of incontrovertible evidence that his story is wrong–his persistent assertion that they broke his ankle even after x-rays proved otherwise is just one example.

Although I agree that Carter's claim that he was beaten at the HSU is highly questionable in light of the falsity of some of his other allegations, it is not provably false, it is not contradicted by any of Carter's prior statements and it does not defy the physical laws of nature. Therefore, summary judgment on this claim is inappropriate. *See Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5 (S.D.N.Y. Sept. 30, 2008) (stating that "[t]hough plaintiff's evidence is minimal—it consists primarily of his own testimony—it is nevertheless sufficient to indicate the existence of a disputed material fact as to whether the force allegedly applied to him was wanton and unnecessary," and that though the evidence indicated that plaintiff's injuries were "not terribly severe, [they we]re sufficient to satisfy Plaintiff's relatively light burden" to show that the force used was excessive); *Seabolt v. City of Muskogee*, No. CIV-07-255, 2008 WL 4693131, at *3 n. 2 (E.D. Okla. Sept. 24, 2008) ("Plaintiff's account of the facts is neither so inherently incredible that no reasonable jury could believe it nor blatantly contradicted by the record"); *Sanabria v. Martins*, 568 F.Supp.2d 220, 228 (D. Conn. 2008) (although plaintiff's "testimony [wa]s indeed contradictory in part and inconsistent with the accounts of other witnesses, . . . Plaintiff's testimony d[id] not come close to the 'incredulous'

24

account rejected by the court in *Jeffreys*"); *Johnson v. Niehus*, No. CV 105-125, 2007 WL 1185675, at *9 (S.D. Ga. Apr. 18, 2007) (although "Plaintiff's testimony . . . [wa]s difficult to square with the evidence of record," that testimony was "not so outrageous or implausible that no reasonable juror could believe . . . his testimony"); *Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *8 (S.D.N.Y. Mar. 27, 2007) ("Whereas a complete video [of the incident in question] might dispel all issues of fact regarding Ford's transfer [during which the alleged assault occurred], an incomplete video cannot"). Defendants are not entitled to summary judgment on this claim.

## III.  Failure to Intervene

The same genuine disputes of fact preclude me from granting summary judgment to defendant Mason on Carter's claim that Mason intentionally failed to protect Carter from the beating administered by Wiegel, Belz and Gallinger in the HSU.   A prison official may be held liable for an Eighth Amendment violation "if [s]he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. at 847.   A prison official may act with deliberate indifference if she "effectively condones [an] attack by allowing it to happen." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010).   Of course, Mason cannot be liable for failing to protect Carter from a beating that never occurred, but that's not the issue at the summary judgment stage.   Because there is a genuine dispute of fact whether the beating occurred, perforce there is a genuine dispute of fact whether Captain Mason condoned the attack by failing to prevent it or end it.

The same is not true, however, regarding defendants Becker and Shannon-Sharpe, who are psych services employees, not correctional officers.  Even if the court assumes, *arguendo*,  that the beating took place, that Carter cried out for help, and that these two defendants heard his cries while standing nearby, they did not violate Carter's constitutional rights by failing to intervene.  It is undisputed that Becker or Shannon-Sharpe had no power or authority with respect to security matters within WSPF.  As the Seventh Circuit explained in *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009), simply because a public employee may know of a danger does not mean that she needs to act to avert it, particularly when such action would go beyond the requirements of the employee's job.  "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service."  *Id*.

In this case, Carter presents no admissible evidence to show that Shannon-Sharpe or Becker had a duty to intervene in security matters, particularly where three officers and their supervising officer already are on the scene.  This remains true even if we assume that the officers were beating Carter: what could two members of psych staff have done, right then and there, to have stopped three correctional officers from beating an inmate under the watch of their captain?  As in *Burks*, Carter has shown at most that Shannon-Sharpe and Becker violated a general duty of rescue, which does not give rise to liability under § 1983, and in any event, they had no power to rescue Carter from any beating that the officers were administering.  Defendants are not entitled to summary judgment on Carter's claim that Captain Mason failed to intervene, but they are entitled to summary judgment on the claim that  Becker and Shannon-Sharpe failed to intervene.

26

**IV. Alleged Failure to Provide Medical Care**

Carter complains about the care provided to him by Waterman and Reid in the HSU on October 11, 2011 in the aftermath of his altercations with the officers, and about the follow-up care provided to him by the HSU staff for his complaints of right ankle pain and swelling and of pain and blurry vision in his right eye.

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The standard set forth in *Estelle* includes both an objective and a subjective component. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

To satisfy the objective component, Carter must demonstrate that he was suffering from an "objectively, sufficiently serious" medical condition. *Brennan*, 511 U.S. at 834 (internal quotations omitted); *see also Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999). As the Seventh Circuit has made clear, "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez*, 111 F.3d at 1371. Notably, "[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

If Carter satisfies the objective component of this test, then he still must satisfy the subjective prong by demonstrating that defendants displayed deliberate indifference to his medical condition. Deliberate indifference is equivalent to reckless or intentional conduct.

*Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002).  At a minimum it requires that a prison official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the prison official actually drew the inference. *Brennan*, 511 U.S. at 837.

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (quotation marks omitted).  A plaintiff can establish such indifference only if the professional's subjective response to plaintiff's medical need was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances."  *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quotation marks omitted).

 A prisoner, however, need not show that he was literally ignored:  "[t]hat the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition.'" *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).


**A.  Reid and Waterman's treatment of Carter in the HSU on October 11**

According to Carter's declaration, when Reid and Waterman came into the exam room on October 11, 2011 he told them that his head had a knot on it and was bleeding; that his right ankle was painful and swollen because Belz had stomped on it; and that his right eye was

28

painful, swollen and blurred.  Carter further alleges that Reid and Waterman told him there wasn't much they could do for him but give him ibuprofen; according to Carter, he replied that he could not take ibuprofen because of his stomach condition.  (Carter does not propose any facts explaining what this "stomach condition" was or why it prevented him from taking ibuprofen.)  Reid and Waterman then ended the medical assessment without providing him any further medical treatment.  Dec. of Tommie Carter, dkt. 83, at ¶¶15-21.

Assuming without deciding that Carter actually had the injuries that he reported to Reid and Waterman, and further, that these injuries are sufficient to establish a serious medical need, Carter fails to present evidence from which a jury could infer that Reid and Waterman acted with the subjective intent required to support a deliberate indifference claim.  Carter admits that Reid and Waterman actually examined him and then offered him pain medication.  Although Carter argues in his brief that this was inadequate, he never says what else he thinks the nurses should have done.  Carter seems to believe that they should have offered him a different form of pain medication, yet he acknowledges that Tylenol was available to him.  In any case, it is well-settled that an inmate is not entitled to demand specific care or to the best care possible, he is only entitled to reasonable measures to meet a substantial risk of serious harm.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).  Carter suggests that offering him ibuprofen was unreasonable in light of his stomach condition, but he does not provide facts explaining this condition or what the nurses knew about this condition that would allow a jury to determine that offering Carter ibuprofen was not an appropriate medical response.

Once the defendants moved for summary judgment, it became Carter's burden to come forth with *evidence* to show that the medical care provided to him was "so far afield of accepted

professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth*, 532 F.3d at 679 (quotation marks omitted).  He has failed to do so. Instead, Carter offers only conclusory assertions, stating that the care provided to him was "inadequate" and that Reid and Waterman were "deliberately indifferent" to his pain and suffering.[16]

It is well-settled, however, that a party may not defeat a motion for summary judgment merely by offering his own self-serving and conclusory assertions.  *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact"); *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1057 (7th Cir. 1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment.") (internal quotation marks omitted).

Instead, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  This is true notwithstanding Carter's pro se status. *See Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir.

---

[16] Carter also accuses Reid and Waterman of falsifying his medical records to cover up the severity of the attack.  This accusation is based on little more than speculation, which may not be used to manufacture a genuine issue of fact. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  In any case, even assuming that Carter's injuries were more severe than noted in the contemporaneous medical notes, Carter does not present any evidence to show that a different course of treatment would have been indicated if HSU staff had accurately recorded his injuries.

2011) ("[W]hen a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own.").  Carter has failed even to articulate what it is that Reid and Waterman should have done differently, or how he was harmed by the actions they did take, much less identify specific evidence in the record to support his claims. Defendants are entitled to summary judgment on this portion of Carter's deliberate indifference claim.

### B.  Follow-up care by defendants Reid, Waterman, O'Connell, White and Cox

Next, Carter contends that the various members of the HSU who treated him for his complaints of right ankle and right eye pain and swelling after the October 11, 2011 incident were deliberately indifferent to his serious medical needs.  At the outset, it is necessary to put to one side Carter's unwavering claim that he sustained an ankle fracture during the altercation in the cell vestibule:  the x-ray taken within weeks of the incident establishes undisputably that he did not.[17]

Carter, however, did file numerous complaints of right ankle pain, and of blurriness in his right eye.  The question is whether Carter has come forth with any evidence from which a reasonable jury could find that any of the HSU defendants either ignored his complaints about his right ankle or right eye or provided treatment that was "so blatantly inappropriate as to

---

[17] Carter argues that the October 31 x-ray evidence is entitled to little weight because it was taken for a different condition (his bunion) and was not taken while he was weight-bearing.  Again, there is no evidence that Carter is qualified to testify about the significance of the medical evidence.  *Walker,* 28 F.3d at 671.  Further, neither of Carter's observations diminishes the fact that the x-ray did not show a fractured ankle.

evidence intentional mistreatment likely to seriously aggravate his condition.'" *Arnett*, 658 F.3d at 751 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7ᵗʰ Cir. 2005)).

Carter has not produced such evidence.  Again, his opposition to this portion of the summary judgment motion consists mostly of his own conclusory assertions that the various defendants did not provide him with "adequate" treatment for his complaints.  Carter does not deny that defendants treated him: as the undisputed facts show, HSU staff saw Carter about his complaints throughout October, and they offered him treatment in the form of Tylenol, ice, ointment for his wrist, eye drops for his eye and exercises for his ankle.  When HSU staff chose not to see him personally on a request, they explained their decision in terms of treatment decisions. Dr. Cox referred plaintiff to an optometrist for his complaints of blurry vision.

Carter complains that the treatment offered by defendants did not help, but he does not suggest what else defendants should have done that might have worked better.  Obviously the defendants were aware of Carter's complaints in this regard and they did not ignore them. Carter offers no evidence suggesting that any of the defendants' treatment decisions were so far afield of accepted professional standards as to raise the inference that these decisions were not actually based on a medical judgment.  Even granting all reasonable inference's in Carter's favor, the most he can possibly show is that defendants were negligent, which is not the same as deliberate indifference.  Deliberate indifference is equivalent to reckless or intentional conduct. *Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002).

In sum, all of the HSU defendants are entitled to summary judgment on Carter's Eighth Amendment claims against them.

**V.  Conditions of Confinement–Placement in Controlled Status**

Finally, Carter alleges that he was subjected to cruel and unusual punishment when he was placed in a controlled segregation cell for one day with inadequate clothing and inadequate heat.  In his complaint, Carter alleged that the temperature in the cell that day was "extreme."

Prisoners have a right to adequate ventilation and freedom from extreme temperatures. *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986).  However, this right is not equivalent to a right to be free from all discomfort.  *Id*.  As this court noted in its order allowing Carter to proceed on this claim, the Eighth Amendment does not "mandate comfortable prisons," and conditions that make confinement unpleasant are not enough to state an Eighth Amendment claim because regular discomforts are "part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  In allowing Carter to proceed on this claim, this court noted that whether Carter's lack of adequate clothing and heating was severe enough to raise Eighth Amendment concerns depended on "just how extreme the temperatures in the cell were."  Then, granting all reasonable inferences in plaintiff's favor, the court assumed that the allegedly "extreme" temperatures were "well-nigh unbearable, essentially amounting to torture."  Order, August, 2, 2012, dkt. 9, at 8.

The evidence adduced on summary judgment refutes this inference.  Mason has testified that the temperature on the units at WSPF is maintained at 68 degrees Fahrenheit or higher and that inmates in controlled segregation are provided with adequate heating and clothing.  The video recording shows that none of the prison staff on the unit that day were wearing clothing such as heavy sweatshirts, coats or hats that would suggest that the unit was unusually cold.  Mason, who placed Carter in the cell, was wearing a short-sleeved uniform.

33

Carter has failed to present any specific evidence to put these facts into dispute.  He simply repeats his conclusory assertion that the temperature in his cell was "extreme" and that his clothing was not adequate.  Carter mentions in his brief that there is documentation supporting his claims, but he has not identified where in the record that documentation appears.  As noted in the pretrial conference order, it is not this court's job to find plaintiff's evidence for him.  *See* "Helpful Hints for Filing a Summary Judgment Motion," ¶2, attached to October 22, 2012 Preliminary Pretrial Conference Order, dkt. 25.  Although Carter is qualified to offer his own testimony about the temperature in his cell and how he felt, these general assertions are too vague to contradict defendants' specific evidence regarding the cell temperature.  *See, e.g., Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690-91 (7th Cir. 2010) (party opposing summary judgment cannot rely on unsupported ipse dixit that is flatly refuted by the hard evidence offered by its opponent); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the truth of the matter asserted.").  The mere fact that Carter may have felt cold for 24 hours is not enough to show that he was deprived of the "minimal civilized measure of life's necessities," so as to establish a claim under the Eighth Amendment.  Defendant Mason is entitled to summary judgment on this claim.

## V.  Appointment of Counsel for Trial

As explained above, the court is granting summary judgment in favor of defendants Becker, Shannon-Sharpe, Reid, Waterman, O'Connell, White and Cox on all the claims against them, and these seven defendants will be dismissed from this case.  The court also is granting

summary judgment on the excessive force claims against Belz, Wiegel and Gallinger for their conduct in the cell vestibule and during transport to and from the HSU, as well as Carter's conditions-of-confinement claim against defendant Mason.  What remains for trial are the excessive force claims against Belz, Wiegel and Gallinger for the alleged beating in the HSU and the failure to intervene claim against Mason.

Five times in this case Carter has asked the court to find an attorney for him, and five times the court has denied these requests.  Now that this lawsuit is headed to trial, I conclude that Carter actually requires the assistance of an attorney to present his remaining claims to a jury.  Accordingly, I am staying proceedings until the court finds a lawyer who is willing to represent Carter.  This usually takes a while—as in several months—so Carter should be patient.

A lawyer agreeing to represent a plaintiff in a case like this one takes the case with no guarantee of compensation for his or her work.  Carter should be aware that once a lawyer appears on his behalf, the lawyer is his go-between with the court and with opposing counsel. The court will not directly communicate with Carter and Carter may not communicate directly with the court.  Carter will have to communicate directly with his lawyer about any concerns and he must allow his lawyer to exercise professional judgment to determine which matters to bring to the court's attention and what motions and other documents to file.  Carter cannot demand that his attorney raise frivolous arguments and cannot insist that his attorney follow every directive that he makes.  Carter must be prepared to accept his lawyer's strategic decisions even if she disagrees with some of them.  Carter must understand that if he cannot cooperate or chooses not to cooperate with the attorney the court finds for him, then it is highly unlikely that the court will recruit another lawyer to represent him in this lawsuit.

ORDER

It is ORDERED that:

(1)  Defendants' motion for summary judgment (dkt. 58) is GRANTED in these parts:

      (a)   Plaintiff's Eighth Amendment failure-to-intervene claims against defendants Shannon-Sharpe and Becker

      (b)   Plaintiff's Eighth Amendment excessive force claims against defendants Gallinger, Belz and Wiegel for their alleged conduct in the cell vestibule and during transport to the HSU;

      (c)   Plaintiff's Eighth Amendment denial of medical care claims with respect to defendants Waterman, Reid, Cox, O'Connell and White; and

      (d)   Plaintiff's conditions of confinement claim against defendant Mason.

(2) Defendants' motion for summary judgment is DENIED in these parts:

      (a)   Plaintiff's excessive force claim against defendants Gallinger, Belz and Wiegel as it pertains to the HSU; and

      (b)   Plaintiff's claim that defendant Mason failed to intervene to prevent the attack.

(2)  The court, *sua sponte*, is ordering the appointment of counsel to represent plaintiff at trial on his remaining claims.  The remainder of the calender is STRICKEN and this case is  STAYED pending recruitment of counsel for plaintiff.

      Entered this 18th  day of October, 2013.

                        BY THE COURT:

                        /s/

                        STEPHEN L. CROCKER
                        Magistrate Judge